## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

DIANA GEE,                                  :
                                            :
                    Plaintiff               :        No. 3:15-CV-2361
                                            :
        vs.                                 :        (Judge Nealon)
                                            :
                                            :                    **FILED**
NANCY A. BERRYHILL, Acting                  :                  **SCRANTON**
Commissioner of Social Security,[1]         :
                                            :                  SEP 1 5 2017
                    Defendant               :
                                            :        PER _____
                                                        DEPUTY CLERK

## <u>MEMORANDUM</u>

On December 8, 2015, Plaintiff, Diana Gee, filed this instant appeal[2] under

42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social

Security Administration ("SSA") denying her applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI")[3] under Titles II and

---

1. Nancy A. Berryhill became the new Acting Commissioner of Social Security on January 23, 2017, and thus replaces Carolyn W. Colvin as the Defendant. <u>See</u> http://blog.ssa.gov/meet-our-new-acting-commissioner/. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

3. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

XVI of the Social Security Act, 42 U.S.C. § 1461, et seq and U.S.C. § 1381 et seq, respectively. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's applications for DIB and SSI will be vacated.

## BACKGROUND

Plaintiff protectively filed[4] her applications for DIB and SSI on November 8, 2012, alleging disability beginning on July 4, 2012, due to a combination of "left foot problems, arthritis (upper back)." (Tr. 15, 176, 179).[5] These claims were initially denied by the Bureau of Disability Determination ("BDD")[6] on February 6, 2013. (Tr. 15). On March 11, 2013, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 15). A video hearing was held on March 24, 2014, before administrative law judge F. Patrick Flanagan, ("ALJ"), at which Plaintiff and impartial vocational expert Linda Vause, ("VE"),

---

4. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

5. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on April 11, 2015. (Doc. 12).

6. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

testified. (Tr. 15). On August 4, 2014, the ALJ issued a unfavorable decision denying Plaintiff's DIB and SSI applications. (Tr. 15-24). On August 13, 2014, Plaintiff filed a request for review with the Appeals Council. (Tr. 11). On November 4, 2015, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-6). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on December 8, 2015. (Doc. 1). On April 11, 2015, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 11 and 12). Plaintiff filed a brief in support of her complaint on May 9, 2016. (Doc. 16). Defendant filed a brief in opposition on July 12, 2016. (Doc. 19). Plaintiff did not file a reply brief.

Plaintiff was born in the United States on August 7, 1968, and at all times relevant to this matter was considered a "younger individual."[7] (Tr. 175). Plaintiff graduated from high school in 1987, and can communicate in English. (Tr. 176, 180). Her employment records indicate that she previously worked as a cashier,

---

7. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

housekeeper, laborer in a factory, and a waitress. (Tr. 181). The records of the SSA reveal that Plaintiff had earnings in the years 1987 through 1991, 1996, 1998 through 2000, and 2002 through 2012. (Tr. 164). Her annual earnings range from a low of thirty-seven dollars and fifty cents ($37.50) in 1988 to a high of thirteen thousand sixty-six dollars and five cents ($13,066.05) in 2008. (Tr. 164).

In a document entitled "Function Report - Adult" filed with the SSA on December 20, 2012, Plaintiff indicated that she lived in an apartment with her family. (Tr. 186). From the time she woke up to the time she went to bed, Plaintiff would "do what [she] could, like clean, cook, take care of [her] son, go to the store . . ." (Tr. 187). She took care of her son by herself as she was a single parent. (Tr. 187). She had no problems with personal care, prepared meals daily for her son "as simple as possible because [she could not] stand for a long time," and, with help, cleaned, cooked, went to the store two (2) to three (3) times a month for at least two (2) hours, and did laundry "with a lot of breaks in between everything." (Tr. 187-190).

In terms of physical abilities and limitations, she noted that: (1) she tried "not to lift anything heavy because it hurt[] [her back];" (2) she could stand for "maybe ten minutes before [she started] to hurt and have to sit down;" (3) she could walk "very short distances because of the pain;" (4) she had "no problem"

4

with sitting; (5) she could kneel but had "a hard time getting up;" (6) she could not squat "for long;" and (7) she had "no problem" reaching, using hands, seeing, hearing, or talking. (Tr. 191-192). She was able to walk "maybe 200 feet" before needing to stop and rest for "a couple of minutes' before resuming walking. (Tr. 193). She noted an air cast was prescribed by a doctor for walking, but that it did not "help at all." (Tr. 193).

Regarding concentration and memory, Plaintiff did not need special reminders to take care of her personal needs, take her medicine, or attend her appointments. (Tr. 188, 190). She could pay bills, handle a savings account, and count change. (Tr. 190). She did not have problems paying attention and could follow written and spoken instructions, but was not able to finish what she started "because of the pain." (Tr. 193). She noted that stress or changes in a schedule did not affect her, and that she did not have trouble remembering things. (Tr. 194).

Socially, Plaintiff went outside "maybe three times a week," drove or rode in a car when she went out, and was able to go out alone. (Tr. 189). Her hobbies included reading, watching television, sewing, taking walks, and playing with her son, and she noted that she did these activities "a lot." (Tr. 190). She spent time with others every day on the computer and on the phone. (Tr. 191). She noted

that since her illnesses, injuries or conditions began, she did not "go anywhere unless [she] need[ed] to." (Tr. 191). She did not have problems getting along with family, friends, neighbors, authority figures, or others. (Tr. 191).

Plaintiff also completed a questionnaire for her pain. (Tr. 194-196). She stated that her foot pain began in July 2012 and her back pain in 2007. (Tr. 194). She indicated she did not have special tests to evaluate her pain. (Tr. 194). Plaintiff described the pain in her left foot as an ache when not "on it" and as stabbing when "on" it, and noted that she stayed off of her left foot as much as possible to relieve the pain. (Tr. 194, 196). Plaintiff described the pain in her back as being located from the "middle of [her] back down," and as a stabbing ache that occurred "all the time." (Tr. 194).

During the administrative hearing on March 24, 2014, Plaintiff testified that she was disabled due to problems with her left foot and back pain. (Tr. 39-40). Regarding her left foot, she testified that, on July 4, 2012, she twisted it and went to the emergency room, where she was diagnosed with an ankle sprain. She stated that, at the time of her hearing, she was still having pain, and that it ached if she walked on it too much, but that it was "comfortable" when she was sitting or not putting weight on it. (Tr. 39). She testified that, regarding her back pain, it was located in between in shoulder blades toward her neck. (Tr. 40). She stated that,

6

to relieve her pain, she went to a chiropractor and took prescription pain medication and Gabapentin. (Tr. 40). She testified that, other than stomach pains when she was on too high of a dosage, she had no side effects from Gabapentin. (Tr. 41).

In terms of limitations, Plaintiff testified that, because of her back pain: she was able to stand and/ or walk for fifteen (15) to twenty (20) minutes maximum; she had difficulty reaching with her arms; she was able to sit for ten (10) minutes before needing to adjust her position; and she could lift and/ or carry up to ten (10) pounds comfortably without hurting her back. (Tr. 42, 51).

In terms of daily activities, Plaintiff stated that she was able to perform household chores for five (5) minutes before needing to sit down to rest for fifteen (15) minutes before continuing. (Tr. 43-44). She testified that she was able to take care of her own personal needs without any difficulty and that she tried to walk regularly, which involved walking around her apartment building two (2) or three (3) times. (Tr. 44, 47). Her hobbies included reading while resting from doing household chores. (Tr. 45). She described a typical day as waking up, getting her four (4) year old son to school, and completing household tasks while her son was at school with breaks every fifteen (15) to twenty (20) minutes. (Tr. 45).

## MEDICAL RECORDS

On July 4, 2012, Plaintiff presented to the emergency room ("ER") at Soldiers and Sailors Memorial Hospital after her left foot became stuck between a boat and the dock while she was stepping onto the boat. (Tr. 261). Plaintiff reported that her pain was mild and that it occurred with weight bearing activities. (Tr. 261). An examination revealed swelling of the left ankle with tenderness and limited range of motion secondary to pain. (Tr. 261-262). An x-ray of Plaintiff's left foot and ankle was performed, and the impression was that there was no evidence of fracture dislocation, but that there was soft tissue swelling in the left ankle, and also revealed calcaneal spurs. (Tr. 267). Plaintiff was diagnosed with a sprained left ankle. (Tr. 262). She was instructed to apply ice intermittently four (4) to six (6) times daily, to wear a splint as needed, and to elevate her the affected area. (Tr. 262). Upon discharge, Plaintiff reported that her pain level was a two (2) out of ten (10). (Tr. 264).

On July 12, 2012, Plaintiff had an appointment at Elkland Laurel Health Center ("ELHC") for a follow-up of her visit to the ER due to foot pain. (Tr. 249). Plaintiff reported she still had pain and swelling localized to the medial ankle. (Tr. 249). An examination revealed Plaintiff's left ankle was swollen and tender, and had a decreased range of motion on inversion and eversion and a positive

8

squeeze test to the metacarpals. (Tr. 250). Plaintiff was prescribed a walking boot to wear daily and was instructed to apply ice three (3) times daily to the affected area, to perform range of motion exercises, and to see an Orthopedist if her pain persisted. (Tr. 250).

On July 13, 2012, Plaintiff underwent an x-ray of her left foot and ankle. (Tr. 252). The impression was that Plaintiff had calcaneal spurs and resolving soft tissue swelling. (Tr. 252, 268).

On August 13, 2012, Plaintiff visited the ER at Soldiers and Sailors Memorial Hospital for eye pain and redness. (Tr. 254). A physical examination performed by Andrew Sayre revealed mild tenderness in her left foot with limited ability to bear weight secondary to pain. (Tr. 255). There was no mention of an examination of Plaintiff's back or upper extremities in the notes from the visit prepared by either Dr. Sayre or Martha Williams, RN, ("Nurse Williams"). (Tr. 255-256). Dr. Sayre diagnosed Plaintiff with acute blepharitis. Plaintiff was discharged with no activity restrictions, according to the notes of both Dr. Sayre and Nurse Williams. (Tr. 257).

On January 9, 2013, Plaintiff underwent an examination performed by Frank Norsky, M.D. due to persistent left foot pain and chronic low back pain. (Tr. 270). It was noted Plaintiff was able to do housework, shop, drive a car, and walk "at

least a two block distance." (Tr. 271). Her physical examination revealed a normal gait and station; no deformities of her lumbar spine; a normal range of motion in forward flexion and extension of the lumbar spine; and morbid obesity. (Tr. 271). She was diagnosed with morbid obesity, and it was noted that her "prognosis for resumption of physical activities depended on the control of her weight." (Tr. 271).

On March 3, 2013, Plaintiff presented to the ER at Saint James Mercy Hospital, where she was diagnosed with morbid obesity, mild asthma, and sepsis secondary to acute bilateral exudative tonsillitis and right breast fold cellulitis. (Tr. 293). Her physical examination revealed 5/5 muscle strength symmetrically with no edema. (Tr. 295). She was discharged on March 7, 2013. (Tr. 293).

On March 13, 2013, Plaintiff had an appointment with John Halpenny, M.D. for left foot pain and ankle problems. (Tr. 299). It was noted that Plaintiff: was limping on her left leg; had slight swelling of the left foot; had tenderness over the lateral side of the foot; had weakness of dorsi flexion and eversion; had good range of motion in the left ankle; and had a palpable pedal pulse. (Tr. 299). An x-ray of her left foot and ankle was ordered to check for a fracture. (Tr. 299).

On March 14, 2013, Plaintiff underwent another x-ray of her left foot. (Tr. 282). No fractures were found. (Tr. 282).

On March 27, 2013, Plaintiff had a follow-up appointment with Dr. Halpenny for bilateral foot pain. (Tr. 301). It was reported that Plaintiff had: a slight limp; tenderness over the dorsum of left foot; a good range of motion with mild discomfort; pain on inversion and dorsi flexion against resistence; and an unremarkable x-ray of her foot. (Tr. 301).

On May 21, 2013, Plaintiff had an appointment with treating physician Adrian Ashburn, M.D. due to "longstanding pain at the base of the neck for the past couple of years which seems to be getting progressively worse." (Tr. 323). Plaintiff reported the pain in her neck as "a cross between a toothache and tingling." (Tr. 323). A physical examination revealed: full range of motion in the neck; tender paravertebral muscles at the base of the neck and thoracic spine; and normal and symmetrical upper extremity sensation, tone, and power. (Tr. 323).

On June 11, 2013, Plaintiff had a follow-up appointment with Dr. Ashburn for neck pain. (Tr. 320). It was noted that Plaintiff had not noticed any improvement since starting physical therapy, and that she complained of a burning sensation from her neck to her mid-back. (Tr. 320). Dr. Ashburn assessed Plaintiff as being obese and having neck and upper back pain in the area of the trapezius muscle. (Tr. 320). Dr. Ashburn prescribed Flexeril and Ibuprofen, ordered blood work, and instructed Plaintiff to continue with physical therapy.

(Tr. 320).

On June 25, 2013, Plaintiff had a follow-up appointment with Dr. Ashburn for her neck pain. (Tr. 319). Plaintiff reported that: (1) physical therapy did not result in improvement and traction made the pain worse; (2) Flexeril and Ibuprofen were not "really helping;" and (3) her chronic neck pain radiated down into her extremities. (Tr. 319).

On June 25, 2013, Plaintiff was discharged from physical therapy at Saint James Mercy Hospital because: (1) there was no noticeable improvement in her upper back and neck pain after four (4) visits; and (2) she canceled an appointment and was a "no-show" for two (2) other appointments. (Tr. 284).

On October 10, 2013, Plaintiff presented to the ER at Saint James Mercy Hospital for left shoulder pain. (Tr. 291). It was noted that Plaintiff awoke in the morning with excruciating left anterior and posterior capsular joint pain that increased with palpation and motion and was partially relieved with positional rest. (Tr. 291). Her physical examination revealed: limited range of motion on adduction, flexion, and extension limited by pain; passive motion with full range of motion, but with pain reaching overhead and with abduction; and point tenderness over the anterior capsule. (Tr. 292). Plaintiff was assessed as having subacromial bursitis and shoulder arthropathy. (Tr. 292).

On October 29, 2013, Plaintiff had a follow-up appointment with Dr. Ashburn for back pain located between her shoulder blades and described by Plaintiff as a burning pain aggravated by standing, using her upper extremities, leaning, and sitting. (Tr. 316). It was noted that, at the time of the appointment, she was "receiving disability." (Tr. 316). It was noted that Plaintiff was able to do "usual activities," and had good exercise tolerance and a good general state of health. (Tr. 316). A physical examination revealed tenderness in the thoracic region and full range of motion without pain. (Tr. 317). Plaintiff was assessed as having a strain of the right trapezius muscle, for which Dr. Ashburn prescribed Gabapentin. (Tr. 317). Dr. Ashburn completed "DSS paperwork" for Plaintiff. (Tr. 317).

On January 29, 2014, Plaintiff had a follow-up appointment with Dr. Ashburn for back pain, which Plaintiff reported was located in her upper back between her scapulae, was constant, and was aggravated by using her upper extremities. (Tr. 309). Plaintiff also reported experiencing heart palpitations for the past six (6) months that were short-lived and lasted seconds. (Tr. 309). A physical examination was unremarkable for the cardiovascular and respiratory systems and revealed tenderness between the scapulae with normal range of motion in the spine and shoulders. (Tr. 310). Plaintiff was assessed as having

palpitations and chronic upper back pain. (Tr. 310). Dr. Ashburn prescribed Gabapentin and Nabumetone and ordered blood work and a Holter monitor test. (Tr. 310).

On February 10, 2014, Plaintiff had a follow-up appointment with Dr. Ashburn due to complaints of palpitations and upper back pain, more specifically between her scapulae. (Tr. 307). It was noted that a Holter monitor test did show a "slightly increased average heart rate of 84," bloodwork revealed a suppressed Thyroid Stimulating Hormone ("TSH"), and that the Nabumetone and Gabapentin prescriptions took "the edge off her upper back pain. . ." (Tr. 307). A physical examination revealed tenderness over the paravertebral muscles bilaterally in the upper thoracic spine. (Tr. 307). Plaintiff was assessed as having chronic upper back pain, morbid obesity, and subclinical hyperthyroidism. (Tr. 307-308). Dr. Ashburn ordered an x-ray of Plaintiff's thoracic spine. (Tr. 308). It is unclear as to whether that x-ray was conducted because no report is included in the medical records.

On February 10, 2014, Dr. Ashburn completed a "Questionnaire" addressing Plaintiff's limitations. (Tr. 303-304). Initially, Dr. Ashburn did not answer the first question on the form, which asked Dr. Ashburn to indicate what the conditions and diagnoses were for which he treated Plaintiff and to indicate

14

what objective findings, clinical findings and credible subjective symptomology established the diagnoses. (Tr. 303). Dr. Ashburn opined then that Plaintiff's medical conditions and/or medication side effects would not cause Plaintiff to have pain, but that they would cause Plaintiff to have fatigue, would diminish Plaintiff's concentration and work pace, and would cause Plaintiff to need to rest at work. (Tr. 303). Dr. Ashburn further opined that Plaintiff: (1) would be off task more than fifteen percent (15%) but less than twenty percent (20%) of the work day; (2) had symptoms that would produce good and bad days; (3) would lead to missed time from work one (1) day or less; (4) experienced dizziness as a side effect of a medication; (5) was able to sit for fifteen (15) to twenty (20) minutes at a time before needing to stretch; (6) should change positions every thirty (30) minutes; (7) could stand and/ or walk for up to two (2) hours in an eight (8) hour workday and for fifteen for fifteen (15) minutes at a time; (8) could safely lift up to five (5) pounds for three (3) to eight (8) hours and up to ten (10) pounds for up to three (3) hours in an eight (8) hour work day; and (9) should never lift over ten (10) pounds. (Tr. 304).

On February 21, 2014, Plaintiff had an appointment with Raj Bala Thakur, M.D., for an initial evaluation of upper back pain after a lifting injury in 2010. (Tr. 324). It was noted that Plaintiff's pain was: located in her upper back

between her shoulder blades with radiation to her neck; was constant, sharp and burning; and involved a feeling of "pins and needles . . . along her back and neck." (Tr. 324). Plaintiff stated her pain: (1) was aggravated by sitting, lying in one (1) spot, and standing; (2) and alleviated by "nothing." (Tr. 324). Her pain level ranged from a seven (7) to nine (9) out of ten (10). (Tr. 324). In terms of activity level, it was noted that Plaintiff had full mobility without assistive devices and independently performed activities of daily living without assistance. (Tr. 324). A physical examination revealed Plaintiff: (1) had full range of motion of the bilateral upper and lower limbs; (2) had marked tenderness to palpation of the upper mid back and neck; (3) was hyperaesthetic to "traps and neck;" (4) had limited back extension and flexion, but full rotation; (5) had full neck rotation, extension, and flexion; and (6) had 5/5 muscle strength in her fingers, elbows, hips, knees, andles, and ankles. (Tr. 327). Plaintiff was instructed to slowly titrate the Gabapentin dose, continue Nabumetone, follow through with x-rays of her spine, and to restart home exercises she learned in physical therapy. (Tr. 328).

**STANDARD OF REVIEW**

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

17

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

18

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs

20

existing in significant numbers in the national economy, considering the

claimant's age, education, work experience, and residual functional capacity. "

Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir.

2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status

requirements of the Social Security Act through the date last insured of September

3, 2015.[8]  (Tr. 17).  At step one, the ALJ found that Plaintiff had not engaged in

substantial gainful work activity from her alleged onset date of July 4, 2012.  (Tr.

17).

At step two, the ALJ determined that Plaintiff suffered from the severe[9]

---

8. It is noted by this Court that this date may be in error, as typically the date last insured falls on the last day of the month provided; therefore, the date last insured may, in fact, be September 30, 2015.  This Court has not been provided with a record of the veracity of the date provided by the ALJ.

9. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 404.921.  Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering.  Id.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

combination of impairments of the following: "a left ankle sprain, chest wall strain, and morbid obesity (20 C.F.R. 404.1520(c) and 20 C.F.R. 404.1520(c))." (Tr. 17).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (Tr. 18-19).

At step four, the ALJ determined that Plaintiff had the RFC to perform less than a range of light work with limitations. (Tr. 19-21). Specifically, the ALJ stated the following:

> [Plaintiff] had the [RFC] to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 20 CFR 404.1567(b), because [Plaintiff] is able to lift and/ or carry twenty pounds occasionally and ten pounds frequently, stand and/ or walk for two hours in an eight-hour workday, and sit for six hours in an eight-hour workday. [Plaintiff] is able to occasionally stoop, twist, laterally bend and rotate the spine, and climb, but [Plaintiff] cannot kneel, crouch, or crawl.

(Tr. 19-21).

At step five of the sequential evaluation process, because Plaintiff could not perform any past relevant work, and considering the her age, education, work experience, and RFC, the ALJ determined "there are jobs that exist in significant

22

numbers in the national economy that the [Plaintiff] can perform (20 C.F.R. 404.1569 and 404.1569(a))." (Tr. 22-23).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between July 4, 2012, the alleged onset date, and the of the ALJ's decision. (Tr. 23).

## DISCUSSION

On appeal, Plaintiff asserts that: (1) the ALJ erred in the determination that Plaintiff's back and neck impairments were not severe impairments because they caused more than a minimal effect on her ability to work; (2) the ALJ erred in the determination of Plaintiff's RFC because it is not supported by any medical opinions; (3) the ALJ improperly weighed the medical opinions; (4) the ALJ failed to properly assess the limitations caused by Plaintiff's obesity; and (5) the ALJ failed to include all limitations in the hypotheticals posed to the VE. (Doc. 16, pp. 8-22) . Defendant disputes these contentions. (Doc. 19, pp. 13-22).

### 1.    Residual Functional Capacity Determination

The responsibility for deciding a claimant's RFC rests with the administrative law judge.   See 20 C.F.R. § 404.1546.  The Court recognizes that the RFC assessment must be based on a consideration of all the evidence in the

23

record, including the testimony of the Plaintiff regarding activities of daily living, medical records and opinions, lay evidence, and evidence of pain. See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 121-122 (3d Cir. 2000). The Commissioner's regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairment(s), including a claimant's symptoms, diagnosis and prognosis, what a claimant can still do despite impairments(s), and a claimant's physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

In arriving at the RFC, an administrative law judge should be mindful that the preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we

will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18. It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion. 20 C.F.R. § 416.927. The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record.

Pursuant to Social Security Regulation 96-6p, an administrative law judge may only assign less weight to a treating source opinion based on a non-treating, non-examining medical opinion in "appropriate circumstances." SSR 96-6p, 1996 SSR LEXIS 3. This regulation does not define "appropriate circumstances," but gives an example that "appropriate circumstances" exist when a non-treating, non-examining source had a chance to review "a complete case record . . . which provides more detailed and comprehensive information than what was available to the individual's treating source." Id. (emphasis added).

Regardless of the weight an administrative law judge affords to medical opinions, the administrative law judge has the duty to adequately explain the

evidence that he or she rejects or affords lesser weight.  Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009).  "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000).

Additionally, in choosing to reject the evaluation of a treating physician, an ALJ may not make speculative inferences from medical reports and may reject the treating physician's opinions outright only on the basis of contradictory medical evidence.  Morales, 225 F.3d at 316-18.  An ALJ may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation, or lay opinion.  Id.  An ALJ may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id.  As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong."  Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant.  See Doak v. Heckler, 790 F.2d 26, 29 (3d Cir. 1986) ("No

physician suggested that the activity Doak could perform was consistent with the

definition of light work set forth in the regulations, and therefore the ALJ's

conclusion that he could is not supported by substantial evidence."); 20 C.F.R. §

404.1545(a).

As two commentators have explained:

> Sometimes administrative law judges assert that they - and not
> physicians - have the right to make residual functional capacity
> determinations. In fact, it can reasonably be asserted that the
> ALJ has the right to determine whether a claimant can engage
> in sedentary, light, medium, or heavy work. The ALJ should
> not assume that physicians know the Social Security
> Administration's definitions of those terms. However, the
> underlying determination is a medical determination, i.e., that
> the claimant can lift five, 20, 50, or 100 pounds, and can stand
> for 30 minutes, two hours, six hours, or eight hours. That
> determination must be made by a doctor. Once the doctor has
> determined how long the claimant can sit, stand or walk, and
> how much weight the claimant can lift and carry, then the ALJ,
> with the aid of a vocational expert if necessary, can translate
> that medical determination into a residual functional capacity
> determination. Of course, in such a situation a residual
> functional capacity determination is merely a mechanical
> determination, because the regulations clearly and explicitly
> define the various types of work that can be performed by
> claimants, based upon their physical capacities.

Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and

Procedure in Federal Courts, 287-88 (2011) (emphasis added). The administrative

law judge cannot speculate as to a claimant's residual functional capacity, but

must have medical evidence, and generally a medical opinion regarding the functional capabilities of the claimant, supporting his or her determination. Doak, 790 F.2d at 29 ; see Snyder v. Colvin, 2017 U.S. Dist. LEXIS 41109 (M.D. Pa. March 22, 2017) (Brann, J.) ("I find that substantial evidence does not support the ALJ's ultimate determination. The ALJ's decision to discredit, at least partially, every opinion of every medical doctor's RFC assessment of Snyder left the ALJ without a single medical opinion to rely upon in reaching a RFC determination. 'Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant.' Maellaro v. Colvin, Civ. No. 3:12-01560, 2014 U.S. Dist. LEXIS 84572, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014)."); Washburn v. Colvin, 2016 U.S. Dist. LEXIS 144453 (M.D. Pa. October 19, 2016) (Conner, J.); Wright v. Colvin, 2016 U.S. Dist. LEXIS 14378, at *45-46 (M.D. Pa. Jan. 14, 2016) (Rambo, J.) ("Chandler stated that an ALJ need not obtain medical opinion evidence and was not bound by any treating source medical opinion. Id. However, both these statements are dicta. In Chandler, the ALJ had medical opinion evidence and there was no contrary treating source opinion. Id. '[D]ictum, unlike holding, does not have strength of a decision 'forged from actual experience by the hammer and anvil of litigation.' . . . the only precedential

holding in <u>Chandler</u> is the unremarkable finding that an ALJ may rely on a state agency medical opinion that the claimant is not disabled when there are no medical opinions from treating sources that the claimant is disabled. <u>See</u> <u>Chandler</u>, 667 F.3d at 361-63. . . . Consequently, with regard to lay reinterpretation of medical evidence, <u>Frankenfield</u>, <u>Doak</u>, <u>Ferguson</u>, <u>Kent</u>, <u>Van</u> <u>Horn</u>, <u>Kelly</u>, <u>Rossi</u>, <u>Fowler</u> and <u>Gober</u> continue to bind district Courts in the Third Circuit."); <u>Maellaro v. </u>Colvin, 2014 U.S. Dist. LEXIS 84572, at *32-34 (M.D. Pa. June 18, 2014) (Mariani, J.) ("The ALJ's decision to reject the opinions of Maellaro's treating physicians created a further issue; the ALJ was forced to reach a residual functional capacity determination without the benefit of any medical opinion. Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. *See Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician suggested that the activity [the claimant] could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."). *See also Arnold v. Colvin*, 3:12-CV-02417, 2014 U.S. Dist. LEXIS 31292, 2014 WL 940205, at *4 (M.D. Pa. Mar. 11, 2014); *Gormont v. Astrue*, 3:11-CV-02145, 2013 U.S. Dist. LEXIS 31765, 2013 WL 791455, at *7 (M.D. Pa. Mar. 4, 2013);

*Troshak v. Astrue*, 4:11-CV-00872, 2012 U.S. Dist. LEXIS 137945, 2012 WL 4472024, at *7 (M.D. Pa. Sept. 26, 2012). The ALJ's decision to discredit, at least partially, every residual functional capacity assessment proffered by medical experts left her without a single medical opinion to rely upon. For example, three physicians opined that Maellaro was limited in some way in his ability to stand and/or walk: Dr. Dittman opined that Maellaro could stand/walk for less than one hour, Dr. Singh believed that Maellaro could stand/walk for fewer than two hours, and Dr. Dawson opined that Maellaro could not stand or walk for any length of time. Tr. 183, 211, 223. In rejecting these three opinions, there were no other medical opinions upon which the ALJ could base her decision that Maellaro essentially had no limitations in his ability to stand or walk. Tr. 283. Consequently, the ALJ's decision to reject the opinions of Drs. Singh and Dawson, and the ALJ's determination of Maellaro's residual functional capacity, cannot be said to be supported by substantial evidence."); <u>Gunder v. Astrue</u>, Civil No. 11-300, slip op. at 44-46 (M.D. Pa. Feb. 15, 2012) (Conaboy, J.) (Doc. 10) ("Any argument from the Commissioner that his administrative law judges can set the residual function capacity in the absence of medical opinion or evidence must be rejected in light of <u>Doak</u>. Furthermore, any statement in <u>Chandler</u> which conflicts (or arguably conflicts) with <u>Doak</u> is *dicta* and must be disregarded. <u>Government</u>

of Virgin Islands v. Mills, 634 F.3d 746, 750 (3d Cir. 2011) (a three member panel

of the Court of Appeals cannot set aside or overrule a precedential opinion of a

prior three member panel). "); Dutton v. Astrue, Civil No. 10-2594, slip op. at 37-

39 (M.D. Pa. Jan. 31, 2012) (Munley, J.) (Doc. 14); Crayton v. Astrue, Civil No.

10-1265, slip op. at 38-39 (M.D. Pa. Sept. 27, 2011) (Caputo, J.) (Doc. 17).

In the case at hand, the ALJ gave significant weight to the findings of Dr.

Sayre,[10] who opined that Plaintiff had "no restrictions to activity," and Dr. Norsky,

who opined that Plaintiff 's "prognosis for resumption of physical activities

depends on the control of her weight," "due to their examinations of [Plaintiff]

and the relative consistency of their observations with the overall medical

evidence . . ." (Tr. 21, , 255, 257, 271). The ALJ gave reduced weight to the

opinion rendered by Dr. Ashburn because "the check-box opinions are not

supported by sufficient explanation and because the opinions are not consistent

with the longitudinal medical evidence in the record . . ." Dr. Ashburn, Plaintiff's

treating physician, opined that Plaintiff: (1) would be off task more than fifteen

---

10. Nurse Williams did not render an opinion regarding Plaintiff's limitations, but
rather was the nurse on duty when Plaintiff presented to the ER on August 13,
2012, for eye pain that was treated by Dr. Sayre. (Tr. 257). Thus, for purposes of
review of the ALJ's determination, the discussion of Dr. Sayre's opinion
encompasses that of Nurse Williams.

percent (15%) but less than twenty percent (20%) of the work day; (2) had symptoms that would produce good and bad days; (3) would lead to missed time from work one (1) day or less; (4) experienced dizziness as a side effect of a medication; (5) was able to sit for fifteen (15) to twenty (20) minutes at a time before needing to stretch; (6) should change positions every thirty (30) minutes; (7) could stand and/ or walk for up to two (2) hours in an eight (8) hour workday and for fifteen for fifteen (15) minutes at a time; (8) could safely lift up to five (5) pounds for three (3) to eight (8) hours and up to ten (10) pounds for up to three (3) hours in an eight (8) hour work day; and (9) should never lift over ten (10) pounds. (Tr. 304).

Plaintiff argues that the ALJ's determination that Plaintiff could lift twenty (20) pounds is not supported by substantial evidence because no doctor opined that Plaintiff could lift that amount of weight and the remainder of the record regarding Plaintiff's activities of daily living does not support that conclusion. (Doc. 16, pp. 10-12). This Court agrees with Plaintiff that substantial evidence does not support the ALJ's RFC determination that Plaintiff could lift up to twenty (20) pounds occasionally for several reasons. First, Dr. Sayre was an emergency room physician who examined Plaintiff for complaints of eye pain and redness. (Tr. 257). While Dr. Sayre opined that Plaintiff had "no restrictions to activity,"

there is nothing in the record to indicate that he was referring to any restrictions having anything to do with any area other than Plaintiff's eyes because, aside from a notation that Plaintiff's left ankle was swollen and tender, her eyes were the only part of Plaintiff's body that Dr. Sayre examined. (Tr. 257). Thus, in terms of functional limitations, especially those involving any weight restrictions, Dr. Sayre's opinion was irrelevant in determining Plaintiff's RFC regarding the functional limitations caused by her neck and back impairments, and, therefore, substantial evidence does not support ALJ's decision to give significant weight to this opinion. Second, Dr. Norsky's opinion that Plaintiff's "prognosis for resumption of physical activities depends on the control of her weight" does not address any functional limitations caused by any of Plaintiff's impairments, but rather is a vague statement of what may or may not occur. (Tr. 271). Therefore, substantial evidence does not support the ALJ's reliance on this statement.

Dr. Ashburn's opinion that Plaintiff could never lift more than ten (10) pounds is the only opinion in the record addressing the amount Plaintiff would be able to lift as a result of her impairments. (Tr. 304). This Court cannot ascertain from the analysis conducted by the ALJ how he was able to determine a residual functional capacity that included an ability to lift twenty (20) pounds occasionally, which differed from the medical findings and opinion of the only physician to

render an opinion limiting Plaintiff to a maximum lifting weight of ten (10)

pounds. Furthermore, the very definition of "light work" found in 20 C.F.R. §

416.967(b) makes it all the more important that this case be remanded, for this

regulation is as follows:

> Light work involves lifting no more than <u>20 pounds</u> at a time
> with frequent lifting or carrying of objects weighing up to 10
> pounds. Even though the weight lifted may be very little, a job
> is in this category when it requires a good deal of walking or
> standing, or when it involves sitting most of the time with some
> pushing and pulling of arm or leg controls. To be considered
> capable of performing a full or wide range of light work, you
> must have the ability to do substantially all of these activities.
> If someone can do light work, we determine that he or she can
> also do sedentary work, unless there are additional limiting
> factors such as loss of fine dexterity or inability to sit for long
> periods of time.

20 C.F.R. § 416.967(b) (emphasis added). The fact that the ALJ gave reduced

weight to the only opinion that addressed weight restrictions and limited Plaintiff

to lifting ten (10) pounds maximum, but then concluded that Plaintiff could

occasionally lift up to twenty (20) pounds, suggests that the ALJ improperly

reinterpreted the medical evidence in arriving at the RFC determination because

the record provides no other evidence to support this conclusion. See <u>Snyder</u>,

2017 U.S. Dist. LEXIS 41109 at *13-14 (Brann, J.) ("The ALJ failed to point to

any specific medical evidence that would support a contrary opinion on Snyder's

standing/walking capabilities, and as a result, it appears that the ALJ was forced to reach a RFC determination without the benefit of any medical opinion. Accordingly, the ALJ's conclusion is not supported by substantial evidence."). Therefore, because it is unclear as to how the ALJ concluded that Plaintiff was able to lift up to twenty (20) pounds occasionally, pursuant to 42 U.S.C. § 405(g), remand is warranted.

This Court declines to address Plaintiff's remaining allegations of error, as remand may produce a different result on this claim, making discussion of them moot. Burns v. Colvin, 156 F. Supp. 3d 579, 598 (M.D. Pa. Jan. 13, 2016); see LaSalle v. Comm'r of Soc. Sec., Civ. No. 10-2011 U.S. Dist. LEXIS 40545, 1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded to the Commissioner of the Social Security Administration.

A separate Order will be issued.

**Date**: September 15, 2017

/s/ **William J. Nealon**
**United States District Judge**

35